UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ARACELIS AYALA, | CASE NO. 1:25-cv-805 |
| Plaintiff, | |
| | MAGISTRATE JUDGE |
| vs. | JAMES E. GRIMES JR. |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| | **MEMORANDUM OPINION** |
| Defendant. | **AND ORDER** |

Plaintiff Aracelis Ayala filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying her applications for supplemental security income and disability insurance benefits. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 5. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural Background**

In August 2020, Ayala filed applications for both supplemental security income and disability insurance benefits, alleging an amended disability onset date of December 24, 2019.[1] *See* Tr. 2791 (noting that Ayala amended her onset

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

date); *see also* Tr. 109, 117 (Ayala's benefits applications). In pertinent part, Ayala alleged that she was disabled and unable to work due to the following impairments: back issues, tendonitis on both wrists, carpal tunnel on both hands, left hand surgery, leg pain, anxiety, depression, and high blood pressure. *See* Tr. 109, 117.

In April 2021, Ayala requested a hearing. Tr. 167. Administrative Law Judge ("ALJ") Penny Loucas held a telephone hearing in September 2021. Tr. 46. Also in September 2021, ALJ Loucas issued a written decision, which found that Ayala was not entitled to benefits. Tr. 16. In October 2021, Ayala appealed the ALJ's decision to the Appeals Counsel. Tr. 215. In August 2022, the Appeals Counsel denied Ayala's appeal of ALJ's September 2021 decision. Tr. 2866. Ayala then filed a complaint in the District Court, but the parties subsequently and jointly agreed to a stipulated remand. Tr. 2894.

In September 2023, ALJ Charlene P. Bellinger issued a Remand Order that provided instructions for further evaluation of Ayala's applications. *See* Tr. 2917–2920. In February 2024, ALJ Loucas held a second telephone hearing on remand. Tr. 2818. Ayala appeared, testified, and was represented by counsel at the February 2024 hearing. *Id*. Qualified vocational expert Laura Pizzurro also testified. *Id*. In March 2024, ALJ Loucas issued a written decision, which found that Ayala was not entitled to benefits. Tr. 2787–2817.

In March 2024, Ayala appealed the ALJ's decision to the Appeals Counsel. *See* Tr. 3008. In February 2025, the Appeals Counsel denied Ayala's

appeal, making ALJ Loucas's March 2024 decision the final decision of the Commissioner. Tr. 2780; *see* 20 C.F.R. § 404.981.

Ayala timely filed this action in April 2025. Doc. 1. In her opening brief, Ayala raises two issues:

> 1. Whether the ALJ erred by failing to incorporate the Plaintiff's need for an ambulatory assistive device into her assigned residual functional capacity.
>
> 2. Whether the ALJ erred by discounting the medical opinions of the Plaintiff's treatment providers.

Doc. 9, at 1.

**Evidence**

The parties do not dispute the ALJ's description of the medical record, so the ALJ's summary of the evidence is incorporated as follows:

> The claimant amended the alleged onset date to December 24, 2019. The 2017 records noted a history of chronic right patellofemoral pain of the right knee. Right knee examination revealed tenderness but good range of motion without motor or sensory deficits (Exhibit B16F 1079).
>
> The October 2017 lumbar spine MRI revealed anatomic alignment with vertebral body heights maintained with multilevel degenerative changes present with mild diffuse disc bulge at L2-L3 causing minimal neural foraminal narrowing. There was mild facet hypertrophic in the lower lumbar spine without any significant narrowing or neural compression (Exhibit B2F 94).
>
> The March 13, 2019, MRI of the cervical spine showed spondylosis C5-C6 bulge with mild stenosis (Exhibit B2 F 94). The claimant underwent left

3

carpal tunnel carpal tunnel release in March 2019 (Exhibit B3F 343). In May 2019 claimant said her left hand and wrist were getting better with increase functional use of her left hand (Exhibit B3 F 287). At physical therapy in June 2019 claimant said her neck symptoms overall felt better with some left upper trapezius spasms that occasionally caused pain, but indicated she was able to manage with a home exercise program to control pain (Exhibit B3F 275).

In January 2020 the claimant's BMI was 41 (Exhibit B2F 310). With Dr. Chang in April 2020, the history noted September 2017 EMG showed mild left median neuropathy and no evidence of radiculopathy or polyneuropathy. The claimant was diagnosed with mild right carpal tunnel syndrome and right de Quervains tenosynovitis (Exhibit B2F 124).

In May 2020 the claimant said she had near-complete relief with a medial branch block with some return of right leg pain after shopping. The claimant was prescribed Prednisone and the assessment noted claimant's left cervical radicular pain had improved after an epidural (Exhibit B2F 131, 135). The June 2020 MRI of the lumbar spine impression was mild lumbar spondylosis with no significant canal or foraminal stenosis treated with Gabapentin and Flexeril (Exhibit B3F 749).

The June 2020 examination revealed 5/5 strength of bilateral extremities, intact sensation, and 2+ reflexes throughout. Physical therapy indicated the MRI did not explain the claimant's leg symptoms (Exhibit B4F 84; B6F 21). The claimant underwent a July 2020 right hip with impression of mild degenerative changes of the hip (Exhibit B6F 133). In September 2020 the claimant said she had complete resolution of her hip pain after a right hip injection. The claimant said her right lower extremity EMG was normal (Exhibit B7F 39).

4

September 2020 with Dr. Cheng, the claimant had a full range of motion of the bilateral wrist, 4+/5 strength, intact sensation, tenderness of the left thumb at the first dorsal compartment, normal stability and sensation, and mildly positive Tinel's. The assessment was right De Quervains tenosynovitis, left wrist De Quervains decompression February 2020, and left wrist carpal release in March 2019 (Exhibit B7F 7). With the claimant's nurse practitioner in November 2020, the claimant said she had 40% pain relief with Zanaflex. She added that she wore an ankle brace for tendinitis of the right ankle, but it could not be addressed until her back was addressed (Exhibit B9F 313). However, there is no evidence the claimant was putting off any ankle treatment due to her back.

On December 10, 2020, due to left De Quervains tenosynovitis, the claimant underwent first dorsal compartment release (Exhibit B 2F 51). In a February 26, 2021, surgery follow-up the claimant had sutures removed, and she had near full range of motion of the fingers (Exhibit B2F 75).

The January 25, 2021, MRI the right hip impression was mild right hip osteoarthritis (Exhibit B8F 25). March 23, 2021, right hand x-ray impression was no significant osseous or articular abnormality of the right hand (Exhibit B9F 289).

The April 14, 2021, MRI the cervical spine impression was central disc protrusion causing moderate to severe narrowing of the canal with mild cord compression with no spinal cord edema. There was mild narrowing the bilateral neural foramina. The disc protrusion and cord compression had progressed when compared to the prior study in March 2019 (Exhibit 9F 288).

On April 27, 2021, with Dr. Kelly the claimant complained of left arm pain with numbness and tingling of the fingers, unsteady gait, and dropping things. The claimant's gait was antalgic with intact

5

strength, sensation, and reflexes throughout. The claimant was offered a C5-C6 anterior cervical discectomy and fusion (Exhibit B10F 65-70). The May 11, 2021, CT of the cervical spine show spondylosis at C5-C6 and large left thyroid nodule measuring 3.1 cm (Exhibit B10F 81). On June 4, 2021, the claimant said she wanted to try another round of epidural steroid injections prior to cervical surgery (Exhibit B10F 166).

When the claimant underwent a thyroid biopsy on June 17, 2021. The vitals noted BMI of 43. The claimant's s motor and sensory examination was grossly intact, and she wore a right ankle brace and walked with a cane. The biopsy was benign, and the claimant underwent thyroid lobectomy (Exhibit B12F 53, 61; B14F 34).

On September 10, 2021, claimant underwent left-sided anterior cervical C5-C6 discectomy with plates and screws at C5-C6 for fixation of the spine (Exhibit B14F 2). On September 21, 2021, the claimant said her presurgical arm pain and weakness were improving and she had no concerns (Exhibit B29F 268). In the October 18, 2021, surgery follow-up the claimant said she was doing well and her presurgical arm pain and weakness were improving and she denied any concerns. Her BMI was 43 and no abnormal physical or psychiatric findings were noted (Exhibit B14F 59).

On August 12, 2022, the claimant complained of left thumb pain with some progressive symptoms over the last several months with difficulty gripping and grasping. The hand x-ray revealed possible basilar joint space narrowing and small calcifications with joint space maintained and no erosions. She had a normal range of motion of cervical spine without evidence of cervical radiculopathy with normal range of motion of the left wrist and negative Tinel's and Phalen's. She had positive CMC grind test with no other symptomatic digits or pain. Impression was left hand pain, trigger thumb, and arthritis of CMC

joint. The plan was anti- inflammatory and splint (Exhibit B13F 18-20).

At orthopedics on August 13, 2022, the claimant complained of right hip pain. Right hip examination revealed 100° flexion, internal rotation 10°, and external rotation 35°. She had intact strength of the DF, PF, EHL as well as intact sensation. The claimant was advised that her hip joint appeared normal with no evidence of avascular necrosis on the MRI, and there was no intra-articular hip pathology present (Exhibit B14F 24-26).

On August 25, 2022, the claimant was seen for right buttocks and groin pain reporting a few hours relief after August 2022 right gluteal bursa injection. Her gait was slow with use of a cane. She had was right hip tenderness with normal range of motion. However, she said since May 2022 that after change from Lyrica to Pregabalin her right ankle symptoms reduced by 40%, Motrin was effective, and she had not seen podiatry since September 2020. She used an AFL brace on the right that allowed her to drive, get around, and control discomfort. She said she was doing well since her cervical surgery (Exhibit B14F 106, 107; B16F 57-58). On October 10, 2022, at hepatology the claimant said she had no concerns, overall doing well, and was actively trying to lose weight. The physical examination was unremarkable (Exhibit B16F 40, 43).

The claimant underwent another lumbar spine x-ray on November 4, 2022, with an impression of no compression deformity and mild lumbar spondylosis (Exhibit B27F 10). In the November 4, 2022, primary care visit, the claimant complained of a mass of the right forearm after IV for endoscopy. The claimant's BMI was 46. In the review system she denied any swelling, spasm, numbness, tingling, anxiety, panic, or memory loss. She was in no acute distress and the physical examination was unremarkable. The assessment was right wrist mass with a plan of ultrasound (Exhibit B18F 10-11). At physical therapy in November 2022 for left

thumb CMC osteoarthritis and trigger thumb symptoms, the claimant said her left thumb felt much better with home program and splinting with some locking of the thumb a couple of days ago. She denied any significant paresthesia or numbness (Exhibit B20F 10, 35).

At orthopedics on November 18, 2022, the claimant had a full range of motion of the left hand, tenderness of the A1 pulley of the left thumb with no frank triggering on examination, and no other digits were significant painful (Exhibit B24F 17).

The May 12, 2023, NCS and EMG showed mild left median neuropathy cross the wrist and chronic left C7 and C8 cervical radiculopathy without active d enervation. The impression noted study interpretation is difficult given the claimant's history of left carpal tunnel release surgery and a mild left median finding may not have any clinical significance (Exhibit B27F 31). At physical therapy in June 2023 the claimant complained of left leg pain and right groin pain. Her gait was antalgic with use of a cane, but she indicated she was able to perform steps independently at home with some difficulty (Exhibit B28F 13-14).

In the September 2023 follow-up noted the claimant complained of back and right hip symptoms. She walked walk with a cane and used a right AFO brace. She had positive straight leg raise test on the right with severely limited right hip range of motion. She had 5/5 strength of bilateral upper extremities with intact sensation. The plan was MRI of the lumbar spine, Mobic, and home exercise program (Exhibit B29F 12-14).

The claimant complained of shoulder pain on September 28, 2023, and some left sided neck pain. The claimant said that after her 2021 cervical discectomy and fusion she had complete resolution of the symptoms, and the claimant did not require physical therapy after cervical spine surgery. Examination revealed a full range of motion of the

8

neck with some left trapezius tenderness. She had a full range of motion of forward extension of left upper extremities 90° with good strength and sensation. The September 12, 2023, cervical spine x-ray showed postsurgical changes from anterior cervical disc fusion at C5-C6 with plate and multiple screws. The hardware appears intact with 2.5 mm retrolisthesis of C5 on C6. The vertebral body heights are preserved, prevertebral soft tissues appeared unremarkable, and there was mild spondylotic changes at C5-C6 and C6-C7. The plan was to continue Mobic and Gabapentin and see neurosurgery (Exhibit 31F 12-15; B29F 532).

The claimant was seen at the emergency department November 27, 2023, complaining of right leg pain for three days. She denied any frank low extremity weakness or sensation loss and that symptoms felt like sciatica that she had in the past. Examination revealed full range of motion of all four extremities and right lower extremity had intact sensation, motor strength of 5/5, intact pulses, 2/4 reflexes, and no abnormal neurological findings noted. The assessment was hemodynamically stable with no concerning signs or symptoms of acute spinal cord compression and examination consistent with sciatica. The claimant was prescribed Prednisone and referred to physical therapy. The assessment was sciatica of right side (Exhibit B32F 9-12).

At Rehabilitation Medical Center on December 8, 2023, the claimant complained of right lower extremity pain behind the right knee and prescribed steroid from emergency department. The history noted September 2023 complaints of left neck and arm pain the claimant described as intermittent and mostly when waking in the morning. The bilateral upper EMG was described as within normal limits in the cervical spine x-ray review as mild spondylitic changes with hardware intact. Physical examination listed limited gait with use of cane, 5/5 upper extremity strength, intact sensation to light touch in the upper extremities, 2+ reflexes throughout,

9

negative Hoffman, negative Spurling, limited range of motion all planes, tenderness to palpation of the bilateral upper trapezius, and positive Tinel of the left elbow. The impression was back pain, right groin pain, left arm pain with normal EMG, left upper trapezius spasm, and pain of the popliteal fossa (Exhibit B32F 1-3).

Regarding the claimant's mental health impairment, she had routine follow-ups for counseling and medications with the most significant findings regarding affect and mood of some dysphoric, constricted, and dysthymic findings and a few complaints of distractibility and some problems maintaining attention and concentration. Otherwise, the vast majority mental status examinations were unremarkable. The claimant's medications appear very effective in managing her anxiety and depression symptoms. Numerous visits noted the claimant's medications were Trazodone, Wellbutrin, Buspar, and Sertraline. September 2020 and October 2020 mental status examination was normal other than an anxious and dysphoric mood and constricted affect. In the October 2020 the claimant said her medications decreased anxiety and improved mood (Exhibit B4F 9-10, 52; B7F 50, 57, 65, 92, 109). In the November 2020 behavior follow-up, the clinical impression was stabilizing with the only abnormal findings of dysphoric mood and constricted affect. The claimant's mood was euthymic and mental status examination was normal in the November 18, 2020, follow-up (Exhibit B7F 155, 161).

In March 2021, the claimant reported attention and concentration problems, but the remainder of the mental status examination was unremarkable (Exhibit B10F 4). In the May 2021 and June 2021, follow-ups the mental status examinations were normal other than an anxious mood and constricted/dysphoric affect (Exhibit B10F 98, 129; B12F 42, 61; B14F 23). The claimant's depression was described as mild in November 2021. Her mood was euthymic, affect was constricted, and the

10

remainder of the mental status examination was normal (Exhibit B14F 70, 83).

In a July 2022 behavior follow-up, the mental status examination was normal. The claimant said she was doing ok in the September 2022 medication visit with some increasing anxiety but also indicated she was getting out more. Her mood was euthymic, and remainder of the mental status examination was unremarkable (Exhibit B14F 101, 108; B17F 53). In November 2022 the claimant said her mood been ok, stable, and anxiety had been up and down. Mental status examination was normal in the assessment remained depression and anxiety (Exhibit B23F 18, 23).

In the March 2023 behavior follow-up, the claimant's mood was dysphoric, affect was constricted, and the remainder of the mental status examination was normal. In the other March 2023 visit, the mental status examination was unremarkable (Exhibit B26F 14, 21). In May 2023 and June 2023 behavior follow-ups the mental status examinations were normal (Exhibit B27F 20, 39). The July 2023 and September 2023 mental status examinations were normal (Exhibit B29F 65; B31F 12). In November 2023 one mental status examinations revealed the claimant's mood was anxious and dysphoric and the other examination was normal (Exhibit B32F 77, 19).

Tr. 2798–2802.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2.  The claimant has not engaged in substantial gainful activity since December 24, 2019, the

11

alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: generalized osteoarthritis and other musculoskeletal conditions of the joints (e.g., right ankle bursitis/tendonitis, right patellofemoral disorder, left thumb osteoarthritis, and de Quervain's disease of the bilateral upper extremities); cervical degenerative disc disease status post ADFC C5-C6; mild lumbar degenerative disc disease; mild right hip osteoarthritis; left carpal tunnel syndrome status post corrective surgery; obesity; major depressive disorder; and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; stand and/or walk 4 hours out of an 8-hour day; and to sit 6 hours out of an 8-hour day; can occasionally operate foot controls bilaterally; can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl. Can

frequently handle and finger bilaterally. Should avoid work tasks that expose one to hazards such as unprotected heights and dangerous moving machinery like power saws and jackhammers. Should avoid work tasks that require hourly production quotas.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on November 24, 1973, and was 44 years old, which is defined as a younger individual age 18–49, on the alleged onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 1563 and 416.963).

8. The claimant has a limited education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from

December 42, 2019, through the date of this
decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 2793–94, 2797, 2806, 2808.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence
of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the
"inability to engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to last for a continuous
period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C.
§ 1382c(a)(3)(A).

An ALJ is required to follow a five-step, sequential analysis to make a
disability determination:

1. Is the claimant engaged in substantial gainful
   activity? If so, the claimant is not disabled.

2. Does the claimant have a medically
   determinable impairment, or a combination of
   impairments, that is "severe"? If not, the
   claimant is not disabled.

3. Does the claimant's impairment meet or equal
   one of the listed impairments and meet the
   duration requirement? If so, the claimant is
   disabled. If not, the ALJ proceeds to the next
   step.

4. What is the claimant's residual functional
   capacity and can the claimant perform past
   relevant work? If so, the claimant is not
   disabled. If not, the ALJ proceeds to the next
   step.

14

> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind

15

might accept as adequate to support a conclusion.'" *Id.* at 103 (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

> 1. *The ALJ did not err by excluding a cane limitation from Ayala's RFC assessment.*

For her first argument, Ayala argues that the ALJ erred "when she did not incorporate [Ayala's] need for an ambulatory device, such as a cane or a walker, into her assigned [RFC]" and by "insist[ing]" that, despite the evidence reporting Ayala's use of a cane, "this cane was not a 'medical necessity' but rather 'a volitional preference.'" Doc. 9, at 18–19.

16

If an assistive device is "not a necessary device for [a] claimant's use, it cannot be considered an exertional limitation that reduce[s] [the claimant's] ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). To be considered a restriction or limitation, an assistive device "must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the [device] is medically necessary." *Murphy v. Astrue*, No. 2:11-cv-114, 2013 WL 829316, at *10 (M.D. Tenn. March 6, 2013) (citations omitted). To be *medically necessary*, the record must reflect "more than just a subjective desire on the part of the plaintiff as to the use of a[n] [assistive device]." *Id.* (citation omitted). And there must be medical documentation "describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." Soc. Sec. Ruling 96-9p, 1996 WL 374185, *7 (S.S.A. July 2, 1996); *see Golden v. Berryhill*, No. 1:18-cv-636, 2018 WL 7079506, at *19 (N.D. Ohio Dec. 12, 2018) ("a cane prescription [that] does not indicate 'the circumstances for which [the cane] is needed,' … does not fulfil the requirements under SSR 96-9p"), *report and recommendation adopted sub nom. Golden v. Comm'r of Soc. Sec.*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019).

"If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the V[ocational] E[xpert]" which includes the use of an assistive device. *Murphy*, 2013 WL 829316, at *10 (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.

17

1993)). Generally, an ALJ's finding that an assistive device is not *medically necessary* is error when the claimant was prescribed an assistive device and the ALJ didn't include the use of the device in the RFC without providing an explanation for omitting it. *Cruz-Ridol v. Comm'r of Soc. Sec.*, No. 1:17-cv-1075, 2018 WL 1136119, at *15 (N.D.Ohio Feb. 12, 2018) (citing *Watkins v. Comm'r of Soc. Sec.*, No. 1:16–cv–2643, 2017 WL 6419350, at *11 (N.D. Ohio Nov. 22, 2017)), *report and recommendation adopted*, 2018 WL 1083252 (N.D. Ohio Feb. 28, 2018).

To find that a "hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing*, and describing the circumstances for which it is needed*." SSR 96-9p, 1996 WL 374185, at *7. To show that an assistive device must have been required, *a claimant* "must also show that his medical records *specifically document the circumstances in which he required an assistive device*—i.e., whether he required one at all times, during all activities, and on all terrains." *Barnes v. Comm'r of Soc. Sec.*, No. 5:21-cv-1688, 2023 WL 2988346, at *8 (N.D. Ohio Mar. 22, 2023) (emphasis added); *see* SSR 96-9p, 1996 WL 374185, at *7.

Here, Ayala does not assert that she had, or cite a record showing that she had, a cane prescription. She also does not point to any persuasive medical evidence that specifically documents the circumstances in which she required an assistive device. *See Barnes*, 2023 WL 2988346, at * 8. Instead, Ayala points

18

to certain records and testimony that she believes support her position that a cane was medically necessary. Doc. 9, at 20. Based on the records she highlights, Ayala claims that "the record [is] filled with evidence that [she] needed a cane to ambulate and balance" and that sometimes she "was so unsteady that even a cane could not support her" so she "used a bilateral walker where she could rest both of her hands." *Id*. While it is clear that Ayala believes she needed a cane, none of the evidence Ayala cites shows that the ALJ's decision to the contrary failed to comply with SSR 96-9p or was unsupported by substantial evidence.

The ALJ explained her opinion that the objective findings in the record did not support Ayala's subjective allegations surrounding limitations for standing, walking, and lifting, including Ayala's allegations that she needed a cane. *See* Tr. 2803 (identifying mild findings in imaging of Ayala's lumbar spine and hip and explaining that Ayala was "advised that there were no findings to support her allegations of lower extremity symptoms and complaints"). So, ultimately, the ALJ concluded that the medical findings did not support the conclusion that a cane is medically necessary. *Id*. Because the ALJ found that the record did not demonstrate a cane was medically necessary, she explained that Ayala's RFC did not include a limitation for use of a cane. Ayala does not argue that this explanation was insufficient. Instead, Ayala essentially argues that the evidence she cited supports a different outcome. Doc. 9, at 19–20. This argument, however, does not provide a basis for remand because it is entirely

19

possible for the evidence to support different conclusions. *See Jones*, 336 F.3d at 477. And Ayala's citation to other evidence in the record to support her position is irrelevant unless she can show that the ALJ's decision was unsupported by substantial evidence. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). The ALJ identified substantial evidence, meaning evidence "more than a mere scintilla," *Biestek*, 587 U.S. at 102, to support her conclusions that a cane was not medically necessary, *see e.g.*, Tr. 2802–03 (explaining the evidence and testimony considered when making the "legal inference and conclusion" that a cane was not medically necessary). So, to the extent that Ayala is challenging whether the ALJ's decision to exclude a cane limitation was supported by substantial evidence, that challenge fails.

Lastly, Ayala claims that "seemingly on her own" the ALJ found that Ayala "did not have a medical need for any assistive ambulatory device, and that their use had been merely 'volitional.'" Doc. 9, at 20. To this end, Ayala claims that the ALJ "played doctor" by (1) using the word "volitional" to describe Ayala's use of a cane or (2) by finding that a cane was not medically necessary. *Id*. at 20–21. Nothing the Ayala cites supports the idea that the ALJ's use of "volitional" to describe Ayala's can use, especially without citation to a prescription for such use, is either inaccurate or improper. Indeed, by definition, if use of a cane is not necessary, then it is voluntary.

Instead, Ayala's point seems to rest on the unsupported implication that the word "volitional" has some clinical or professional import such that, by

using that word, the ALJ "played doctor." And, to the extent that Ayala is more generally arguing that the ALJ's conclusion that a cane was not medically necessary amounted to "playing doctor," that argument fails. It is for the ALJ to assess the medical evidence and determine whether an assistive device is medically necessary. *See* SSR 96-9p, 1996 WL 374185, at *7 (explaining what "the adjudicator" must consider when determine whether a hand-held assistive device is medically required).

To review, Ayala has not identified any evidence that demonstrates a cane was medically necessary, such that it could have been error to exclude a cane limitation from her RFC. Ayala has also failed to show that the ALJ's decision that a cane was not medically necessary was unsupported by substantial evidence. Her first issue, thus, does not support remand.

### 2. The ALJ's consideration of the medical evidence complied with applicable regulations.

Ayala next argues that the ALJ "disregarded" two treating provider opinions, which contradicted the ALJ's RFC determination "despite [the] persuasiveness" of those two opinions. Doc. 9, at 22.

Under the current regulations, the Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he

21

more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

*Nurse Practitioner Ann Harrington*

Ayala first argues that the ALJ erred in her evaluation of Nurse Harrington's opinion. As to Nurse Harrington's opinion, the ALJ said this:

> On August 4, 2021, the claimant's nurse, Ann Harrington, indicated the claimant could occasionally lift 20 pounds, frequently lift 15 pounds, stand, and walk two hours of an eight-hour workday, could never perform postural activity, frequently use the upper extremities, should not have any not

22

exposure to heights or temperature extremes, and the claimant had been prescribed a cane, walker, and brace. The report indicated the basis of the opinion was review of imaging and the claimant's reports (Exhibit B11F, B17F 476). The claimant is clearly not this limited posturally and there is no objective evidence she is this limited in standing or walking. The opinion admits reliance on the claimant's reports and the mild findings in imaging of the hip, spine, and significant improvement of the claimant's cervical condition with surgery are inconsistent with this level of limitations. The lifting and carrying limitations are generally persuasive in light of the objective evidence in the record but the remainder the opinion is not consistent with or supported by the record. The opinion is not supported by sufficient documentation of evidence, clear articulation for the basis of the opinions, and with finding consistent with the records from the nurse or other objective medical evidence of record. Similarly, the less than sedentary work limitations reported by a treatment provider in April 2019 and May 2019 are not persuasive because they record does not support the claimant is this limited (Exhibit B16F 1544, 1549).

Tr. 2805.

Here, the ALJ showed how she considered the consistency of Nurse Harrington's opinion by explaining that Ayala is "clearly not this limited posturally and there is no objective evidence she is this limited in standing or walking." *Id*. This comment, though the word consistency is not used, references the objective evidence elsewhere in the record and compares it to the limitations opined. *See* 20 C.F.R. § 404.1520c(c)(2). Importantly, the fact that the ALJ did not use the word *consistency* is not fatal because there is no requirement that the ALJ use any magic words. *Cormany v. Kijakazi*, No. 5:21-

cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (collecting cases). Additionally, the ALJ explained that "[t]he opinion admits reliance on the claimant's reports" and pointed out that "the mild findings in imaging of the hip, spine, and significant improvement of the claimant's cervical condition with surgery are inconsistent with this level of limitations." Tr. 2805. This explanation shows that the ALJ considered how Nurse Harrington described or cited evidence to support her opinion—i.e. the supportability factor. *See* 20 C.F.R. § 404.1520c(c)(1). And, to avoid any doubt, the ALJ explicitly stated that Nurse Harrington's opinion "is not supported by sufficient documentation of evidence, clear articulation of the basis of the opinions, and with finding[s] consistent with the records from the nurse or other objective medical evidence of record." Tr. 2805. This sentence summarizes the ALJ's consideration of both supportability, by identifying the lack of evidence documented or articulation contained within the opinion, and consistency, by comparing the opinion to other medical records.

Despite the above, Ayala argues that the "dismissal of Nurse Harrigton's medical opinion is unwarranted, as her findings are supportable and far more consistent with the medical evidence than the residual functional capacity assigned by ALJ Loucas." Doc. 9, at 22. Ayala then continues by citing medical records that she apparently believes support Nurse Harrington's findings and demonstrate a need for greater limitations. *See* Doc. 9, at 22–23. While the records Ayala cites may support her alternative weighing of the evidence, they

do not show that the ALJ failed to consider the mandatory factors of supportability and consistency. Instead, these citations only illustrate that her position amounts to a dispute over the ALJ's weighing of the evidence. But weighing the evidence is the ALJ's responsibility, not this Court's. *See* 20 C.F.R. § 404.1520c(a) (explaining how the ALJ will consider and weigh medical opinions and prior administrative medical findings); *see also Rottman v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 196 (6th Cir. 2020 ("[T]his court does not weigh evidence, assess credibility, or resolve conflicts in testimony—that's the ALJ's job.") (citation omitted)). While it is entirely possible for the evidence to support greater limitations, as Ayala insists, that possibility alone does not support remand because a record can, and often does, support two outcomes. *See Jones*, 339 F.3d at 477. In any event, Ayala's argument heading only indicates a challenge to the ALJ's consideration of the medical opinion evidence. Doc. 9, at 1, 20. So, to the extent that Ayala is making arguments not indicated in her subject heading—like, for instance that the ALJ's decision was not supported by substantial evidence—those arguments are forfeited. *See* Doc. 6, at 3 ("Each introductory heading in the Argument or Analysis section of a brief must correspond to the argument presented under the heading. Failure to comply with this requirement may result in … waiver of the arguments in the heading and in the text following the heading.")

As the above demonstrates, the ALJ properly considered Nurse Harrington's opinion and Ayala's argument apparently asking the Court to

reweigh evidence is improperly presented and otherwise does not provide a basis to remand.

*Counselor Michael Allen*

Next, Ayala argues that the ALJ failed to consider the supportability and consistency of Counselor Allen's opinion. As to Counselor Allen's opinion, the ALJ explained:

> The claimant's counselor, Michael Allen, on November 11, 2020, indicated the claimant had moderate to marked limitations from mental impairments of anxiety and depression (Exhibit B7F). As discussed in this decision, there are no mental status findings to support the claimant was this limited, the claimant remains very functional, and there is no evidence of any hospitalizations or emergent treatment for mental health symptom. The record simply does not support more than a moderate limitation in concentrate, persistent, and maintain pace. The opinion is not consistent with or supported by the findings in the record and is therefore not persuasive.

Tr. 2805.

Here, though her analysis was more abbreviated than in relation to the ALJ's consideration of other opinions, the ALJ discussed both supportability and consistency. As to supportability, the ALJ stated that Counselor Allen's opinion is not "consistent with or supported by the findings in the record and is therefore not persuasive" Tr. 2805. This statement shows that the ALJ considered the supportability factor and, in doing so, found that Counselor Allen's opinion lacked sufficient support from the record for his conclusions.

26

*See* 20 C.F.R. § 416.920c(c)(1). Moreover, Counselor Allen's opinion is found in a check-the-box form, *see* Tr. 1884–85, which, though the ALJ did not specifically discredit the opinion on this basis, renders it "patently deficient." *See Dollinger v. Comm'r of Soc. Sec.*, No. 22-3359, 2023 WL 1777386, at *4 (6th Cir. Feb. 6, 2023) (holding that a check-the-box form completed by a treating source, which only contained a brief explanatory note for the assessed limitations, "is the kind of 'vague and unhelpful' opinion that is patently deficient and could not have been credited by the Commissioner") (quoting *Price v. Comm'r Soc. Sec. Admin.*, 342 F. App'x 172, 176 (6th Cir. 2009)); *Price*, 342 F. App'x at 176 (holding that a doctor's reference to "testing" to support his conclusions on a questionnaire were "vague and unhelpful" and did not provide "objective medical evidence to support his" conclusions)).

Next, the ALJ explained that "there are no mental status findings to support" the opinion that Ayala "was this limited, [Ayala] remains very functional and, there is no evidence of any hospitalizations or emergent treatment for mental health symptom[s]." Tr. 2805. The ALJ continued by stating that "[t]he record simply does not support more than a moderate limitation in" Ayala's ability to "concentrate, persist[], and maintain pace." *Id*. These explanation show that the ALJ considered how Counselor Allen's opinion compared to other medical evidence in the record—i.e., consistency. 20 C.F.R. § 416.920c(c)(2). As the above demonstrates, the ALJ's consideration of Counselor Allen's opinion complies with the applicable regulations.

27

Finally, as discussed in relation to Ayala's arguments related to Nurse Harrington's opinion, Ayala's citation to evidence elsewhere in the record that she believes supports greater mental limitations is irrelevant to this Court's evaluation of whether the ALJ properly considered the opinion evidence—the sole claim presented in Ayala's second issue statement. *See* Doc. 9, at 1, 21. So to the extent that Ayala cites additional evidence in an attempt to argue that the ALJ's decision is unsupported by substantial evidence, that argument is forfeited. *See* Doc. 6, at 3. Even still, Ayala's citation to evidence in an effort to argue for a different outcome does not show that the ALJ's decision was unsupported by substantial evidence such that remand might be required. *See Warner*, 375 F.3d at 39. In sum, none of the arguments raised in connection to the ALJ's evaluation of Counsel Allen's opinion support remand.

**Conclusion**

For the reasons explained above, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

Dated: December 10, 2025          */s/ James E. Grimes Jr.*
                                  James E. Grimes Jr.
                                  U.S. Magistrate Judge